**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00339-2 (RDM)** |
| **v.** | : | |
| | : | |
| **COUNTRY CRAMER,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Country Cramer to seven days' incarceration, 36 months' probation, 60 hours community service, and $500 restitution.

**I.      Introduction**

Defendant Country Cramer, a 38-year-old unemployed electrician, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.

Defendant Country Cramer pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because Country Cramer (1) prepared for violence by bringing a helmet and a baseball bat to the Capitol; (2) observed the deployment of crowd control measures by law enforcement on the Lower West Terrace, such as pepper spray, but nonetheless pressed ahead with other rioters and entered the

1

Capitol through the Senate Wing Door; and (3) did not tell the truth when questioned by law enforcement agents about his conduct on January 6, 2021.

The Court must also consider that Country Cramer's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Country Cramer's crime support a sentence of seven days' incarceration.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 40 (Statement of Offense), at 1-7.

### *Defendant Country Cramer's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, the defendant, Country Cramer, and his brother, co-defendant Eric Cramer, travelled from West Virginia to Washington, D.C. by automobile to support members of Congress who were challenging the 2020 election results. *See id*. ¶ 8. They were prepared for possible violence. Country Cramer was dressed in a black helmet adorned with a black mohawk, a camouflage neck/face cover, black hooded sweatshirt, blue gloves, and blue jeans.  He carried a red and white megaphone, black backpack, and a wooden miniature baseball bat. *Id*. ¶ 9. Exhibit 1, below, is a picture taken on January 6, 2021 of Country (red) and Eric (blue) Cramer:

**Exhibit 1**



At about 2 p.m., Country Cramer joined the mob on the Lower West Terrace of the Capitol grounds. ECF 40 ¶ 10. Violence was breaking out between the mob and law enforcement at that time, and law enforcement was deploying crowd control measures, such as tear gas, to disperse the mob. Country Cramer had become separated from Eric Cramer and believed that he had entered the Capitol building. *Id*. Country Cramer proceeded from the Lower West Terrace to the Upper West Terrace and entered the Capitol through the Senate Wing Door at 2:50 p.m. *Id*. Country Cramer would have observed signs of forced entry, including broken windows, rioters climbing through windows, and audible alarms. He reunited with his brother, Eric Cramer, inside the Capitol building. *Id*. While inside, Country Cramer chanted "U.S.A." through a megaphone. *Id*. Exhibits 2-4, below, are screenshots from CCTV showing Country Cramer just inside the Senate Wing Door:

**Exhibit 2**



**Exhibit 3**



**Exhibit 4**



Country Cramer was inside the Capitol building for approximately two minutes, prior to exiting to the Upper Northwest Terrace, where he took pictures of the crowd and remained with his brother, Eric, until after 3:06 p.m. ECF 40 ¶ 10. Exhibit 5, below, is a picture of Country Cramer on the Upper Northwest Terrace:

**Exhibit 5**



*Defendant Country Cramer's First Interview*

On January 19, 2021, Country Cramer was interviewed by Special Agents with the FBI immediately following the agents' in-person interview of his brother, Eric Cramer. Country Cramer confirmed that he had driven to Washington, D.C. with his brother, Eric, on the morning of January 6, 2021. They believed the events that day would have historical significance.

Country Cramer told the agents that he did not enter the U.S. Capitol building and was unaware that Eric Cramer had entered the building until they were later reunited. He said that upon arriving at the Capitol, he and his brother, Eric, walked from the East side of the Capitol building to the West side of the building. On the West side, Country Cramer detected pepper spray in the air, which was extremely irritating to his eyes.

Country Cramer then told the agents that once he detected the pepper spray, he walked towards the reflecting pool area of the Capitol complex grounds and was separated from Eric Cramer. Country Cramer stated that he waited near the reflecting pool area and was reunited with Eric Cramer near the reflecting pool after an extended period. He told the agents that he was never in position to observe individuals breaching the Capitol doors or illegally entering the building.

*Defendant Country Cramer's Second Interview*

On August 17, 2021, Country Cramer was re-interviewed at his mother's residence located in Augusta, West Virginia. He stated that he and his brother, Eric, travelled to Washington, D.C. on January 6, 2021, to see former President Trump speak and be part of history. After the speech, they walked to the East side of the U.S. Capitol Building. Country Cramer heard people saying that others were going inside the Capitol on the West side of the building. Country and Eric Cramer then walked to the West side of the Capitol building.

Country Cramer became separated from Eric after mist from pepper spray irritated Country Cramer's eyes. Country Cramer said that, about ten minutes later, when he had not seen his brother come out of the Capitol building, he went in to find him. He found Eric standing just inside the doorway. They exited the Capitol through a window beside the door they entered. They went back to West Virginia on January 6, 2021.

Country stated that he and Eric Cramer had helmets and bats when they went to D.C. because they had seen other rallies turn violent on television. Most of them ended violently, and they did not want to be victimized. Country stated that he had recently purchased a new cellular phone and did not have any photos or videos from his trip to D.C.

*The Charges and Plea Agreement*

On July 1, 2022, the United States charged Country Cramer and Eric Cramer by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On July 8, 2022, law enforcement officers arrested them at the U.S. Courthouse in Martinsburg, West Virginia. On October 14, 2022, the United States charged Country Cramer and Eric Cramer by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 25, 2022, pursuant to a plea agreement, Country Cramer pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Country Cramer agreed to pay $500 in restitution to the Architect of the Capitol.[1]

---

[1]   On October 25, 2022, Eric Cramer pled guilty to Count Two of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(2).  Sentencing is scheduled for February 23, 2023.

### III.     Statutory Penalties

Country Cramer now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of seven days' incarceration, 36 months' probation, 60 hours community service, and $500 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Country

8

Cramer's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Country Cramer, the absence of violent or destructive acts is not a mitigating factor. Had Country Cramer engaged in such conduct, he or she would have faced additional criminal charges.

One of the most important factors in Country Cramer's case is that he prepared for violence by bringing a helmet and a baseball bat to the Capitol. By his own admission, Country Cramer observed that officers were actively attempting to keep rioters out of the Capitol and were deploying crowd control measures on the Lower West Terrace, such as pepper spray. He proceeded toward the area where police were fighting with rioters. He then made his way up the stairs to the Upper Northwest Terrace, where he entered the Capitol building, despite obvious signs the building was closed to the public and signs of forced entry, such as broken glass and audible alarms, through the Senate Wing door at 2:50 p.m. He remained inside for approximately two minutes before exiting to the Upper Northwest Terrace until approximately 3:06 p.m.

Country Cramer's statements to law enforcement following January 6, 2021 are also troubling. When initially interviewed on January 19, 2021, Country Cramer did not tell the truth about entering the Capitol building. It was not until seven months later that Country Cramer admitted that he had entered the building. Country Cramer's brother, Eric, also told the same stories to law enforcement at the same times as Country Cramer, which suggests that the brothers coordinated their stories before speaking to the interviewing agents.

To date, Country Cramer has not shown remorse for his actions on January 6, 2021.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Country Cramer

As set forth in the PSR, Country Cramer's criminal history consists of a 2003 conviction, when he was 18 years old, for Negligent Homicide – Involuntary Manslaughter, arising from an incident in which he was the driver of a vehicle involved in an accident where a passenger died after being ejected from the vehicle. Country Cramer was sentenced to one year of incarceration. ECF 43 ¶ 24. In 2009, Country Cramer was convicted of reckless driving after originally being charged with driving under the influence. *Id*. ¶ 25. There are two additional arrests in Country Cramer's criminal history, one in 2002 for driving under the influence and another in 2009 for conspiracy to commit assault and battery. Both charges were dismissed. *Id*. ¶¶ 27-28.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Country Cramer's planning for violence on January 6, 2021, by bringing and wearing riot gear, and his criminal conduct detailed above show a lack of respect for the law. His attempt to cover up his entry into the Capitol building by lying to the FBI in his first interview and his failure to express remorse to date underscore his disregard for the law.  A sentence of incarceration is necessary to deter Country Cramer from future crimes.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Country Cramer based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Country Cramer has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

---

[2] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

**Non-Guidelines Cases**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Jennifer Heinl*, 21-cr-370, the defendant pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 14 days' incarceration and 24 months' probation.  In that case, Heinl witnessed clashes with police outside the Capitol but chose to enter the Capitol anyway; entered through the Senate Wing Door within 10 minutes of its initial breach; remained in the Capitol for 47 minutes; made false statements to the FBI; and demonstrated a lack of remorse during a post-plea interview with the FBI.  Although Heinl remained in the Capitol far longer than Country Cramer, she did not bring a baseball bat to the Capitol, and she had no prior record, unlike Country Cramer.

Diana Santos-Smith, 21-cr-271, pled guilty to one count of 5104(e)(2)(G) and was sentenced to 20 days' incarceration and 3 years' probation. With her co-defendant, she twice entered the Capitol via the Senate Wing Door, climbing through a broken  window just north of the Door the first time and remaining inside two minutes and climbing through a broken window just south of the door the second time and remaining inside for over one minute.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. [3]

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to seven days' incarceration, 36 months' probation, 60 hours community service, and $500 restitution. Such a

---

[3] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case); see generally Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Andrew J. Tessman*
ANDREW J. TESSMAN
Assistant United States Attorney
District of Columbia – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 15th day of February, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:     */s/ Andrew J. Tessman*
ANDREW J. TESSMAN
Assistant United States Attorney
District of Columbia – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov

19